350 So.2d 907 (1977)
U.S. OIL OF LOUISIANA, LTD., et al.
v.
LOUISIANA POWER & LIGHT CO.
No. 10937.
Court of Appeal of Louisiana, First Circuit.
June 28, 1977.
Rehearing Denied August 24, 1977.
*908 Claude D. Vasser, John V. Baus and Herbert W. Cristenberry, Jr., New Orleans, for plaintiffs and appellees.
Donald L. Peltier, Peltier & Peltier, Thibodaux, Eugene G. Taggert, Monroe & Lemann, New Orleans, for defendant and appellant.
Edward J. Rice, Jr., Adams & Reese, New Orleans, for third-party defendant and appellee Ward Transformer Co.
Charles J. LeBlanc, Thibodaux, for third-party defendants, Clyde J. Naquin and Leon J. Naquin and Sons, Inc.
Before LANDRY, EDWARDS and COLE, JJ.
EDWARDS, Judge.
U.S. Oil of Louisiana, Ltd., John W. Mecom, Sr., Mary Elizabeth Mecom and U.S. Oil of Louisiana, Inc., together with their partial subrogees, The Travelers Indemnity Company and Aetna Casualty and Surety Company, and other parties by later amendment, filed suit for damages to U.S. Oil of Louisiana, Ltd.'s sulfur plant mining facilities located at Chacahoula, Louisiana. The damages resulted from a power outage at the plant on February 5, 1968, a power outage and fire at the plant on August 25, 1968, and a power outage and fire at the plant on October 2, 1968. The defendant, Louisiana Power & Light Company, brought third party actions for indemnification and/or contribution against Ward Transformer Company, Inc., and Wayne Johnson d/b/a Continental Transformer Company for any damages for which it might be liable as a result of the February and August incidents, and against Clyde Naquin and Sons, Inc., for any damages for which it might be liable as a result of the August incident. Ward Transformer Company, Inc., brought a third party action against Clyde Naquin and Leon Naquin and Sons, Inc., for indemnity and/or contribution for any damages for which it might be liable as a result of the August outage and fire.
*909 The trial court rendered judgment in favor of the plaintiffs in the amount of $111,770.81 plus interest, and in favor of Aetna Casualty and Surety Company, the plaintiffs' subrogee (for the October 2 incident), in the amount of $5,112.60 plus interest. The total award mentioned above represented damages resulting from incidents of February 5, 1968 and October 2, 1968. The trial court held that Louisiana Power & Light Company was liable for the outage of February 5, 1968, resulting in an award of damages totaling $21,170.03. Louisiana Power & Light Company admitted liability for the October 2, 1968, outage and fire. For the October 2, 1968, incident, the court awarded total damages of $95,713.38, which represented $41,350.79 as the stipulated damages to the plant; $1,792.59 as the cost of employee overtime; and $52,570.00 as the value of lost production. The third party demands were dismissed.
The fee of the court-appointed expert, Dr. Charles Monier, was fixed at $2,784.00 and taxed as costs. Costs were ordered equally divided between plaintiffs and defendant.
Defendant now appeals, contending that the trial court erred in holding it liable for the February 5, 1968 electrical outage and further erred in awarding damages to plaintiff for loss of production. Plaintiff appeals also, and argues that the Court's award of damages was inadequate, that the Court erred in failing to hold defendant liable for the August 25, 1968 outage, that the Court erred in considering the report of its expert, Dr. Monier, and that all costs should have been borne by defendant.
For purposes of our review of this involved dispute, we will treat the various issues as follows: (1) the report of the court-appointed expert, (2) liability for the two outages, (3) the award of damages, and (4) the levy of costs.
REPORT OF COURT-APPOINTED EXPERT
The trial of this matter terminated on May 10, 1973. Subsequently, on February 8, 1974, the trial court, on its own motion pursuant to LSA-C.C.P. art. 192, appointed Dr. Charles Monier, electrical engineer, as its expert to consult with, advise and assist the court in the adjudication of the case.
Dr. Monier, after review of the transcript, exhibits, and briefs of counsel, rendered a written report to the court on July 31, 1975, and a supplemental report on August 21, 1975 which reports were filed in the record of this case on February 23,1976. The trial court rendered judgment on March 30, 1976.
At issue is the propriety of this procedure.
In his report, Dr. Monier evaluated the various opinions propounded by the experts who testified at trial. He weighed the evidence, noted corroboration and contradiction therein, and reached conclusions as to the probable causes of the outages.
We hold that the trial court erred in considering Dr. Monier's report in reaching a decision in this case.
The proper role of the court-appointed expert under LSA-C.C.P. art. 192 is to provide the judge with facts and information necessary for a complete and just determination of the issues. It is not the function of that expert to decide or to judge the case, or to engage in any of the corollary functions thereof. Moreover, that expert, as any other expert, clearly should be subject to cross examination by the parties. Otherwise, and as here, the report is objectionable and inadmissable as hearsay. The authority of the trial court pursuant to Article 192, however broad, does not include the right ex parte to consider evidence obtained without affording the parties the opportunity of cross examination. Our review, therefore, will exclude the report of Dr. Monier.
OUTAGE OF FEBRUARY 5, 1968
The cause of this outage was the failure of one of the three transformers in the Louisiana Power & Light Company sub-station adjacent to the U.S. Oil of Louisiana, Ltd., plant. On February 5,1968, prior *910 to the transformer failure, a 100 amp fuse on the 13 kv lateral line serving the sub-station blew. The trial court held that the failure of this fuse was notice to L.P. & L. that a defect may have existed in its equipment and that replacement of the fuse with a solid blade switch, without an investigation as to possible dangerous conditions, was negligent conduct by L.P. & L. Therefore, the trial court held L.P. & L. liable for damages sustained due to the February 5, 1968 outage.
In Olivedell Planting Co., Inc. v. Town of Lake Providence, 217 La. 621, 47 So.2d 23, 29 (1950), the Court stated that:
"An electric company is under a duty to make reasonable and prompt inspection of its wires and appliances; and, where the defect does not arise from an electric company's negligence, its liability turns on whether it knew, either actually or constructively, of the dangerous condition in time, by the exercise of reasonable care, to have avoided the injury."
The evidence adduced at trial shows that the cause of the transformer failure on February 5, 1968 was unknown. Thus the defect did not arise from L.P. & L.'s negligence. Liability, therefore, must turn on whether the failure of the fuse was notice to L.P. & L. of a dangerous condition. Plaintiffs argue that the transformer was damaged by lightning when the fuse blew, and that, had L.P. & L. investigated this dangerous condition (a transformer damaged by lightning) they would have learned of the damage and possibly forestalled the outage.
L.P. & L., on the other hand, contends that the fuse blew because of gradually increasing load on the customer side, a normal occurrence. Mr. Joseph Pardue, expert witness for L.P. & L. testified that, in such a situation, it was standard practice to install a switch which simply assimilates the lateral into the main distribution circuit.
To support their allegation, plaintiffs rely on the letter of November 11, 1968 from Mr. R. E. Ward, President of Ward Transformer to Louisiana Power & Light. In that letter Ward stated that lightning had damaged the transformer. However, Ward later testified at trial and repudiated the letter, admitting that he had written the letter simply to tell L.P. & L. anything just to get by. He never examined the transformer. In fact, there is no credible evidence whatsoever that lightning damaged the transformer, but only speculation on the plaintiffs' part. Moreover, L.P. & L's explanation for replacing the fuse with a switch is reasonable and unrebutted. There is no evidence in the record connecting the transformer failure with the earlier blown fuse. Therefore, it was error for the trial judge to have concluded that the blown fuse was notice to L.P. & L. of a defect in their equipment. Absent such notice, no duty was breached by L.P. & L. in failing to investigate further.
Plaintiffs cite the case of Hughes v. Louisiana Power & Light Company, 94 So.2d 532 (La.App.1st Cir. 1957) as supporting their position. The difference in that case and the instant one is that in the former it was clearly established that lightning caused the fuse to blow. The Court stated therein that:

"Had the replaced fuse been simply burned out, such as might have been compatible with a normal cause such as an overload on the line, then we do not think that the electric company's employees were under any duty to anticipate equipment or wiring so defective, that their resumption of electrical service by replacing the fuse might cause damage to plaintiff's property. But under all the circumstances of this case, the fuse replaced by defendant's employees was burned and charred to such an extent that defendant's employees (with their specialized knowledge) were put on notice of the good probability that the wiring had been damaged beyond the fuse by a surge of lightning, and that because of this it was dangerous to resume electrical service; and therefore, as a consequence of this presumed knowledge, the replacing of the fuse permitting the resumption of electrical service to plaintiff's milking machine circuit without taking some safeguarding *911 precaution or warning plaintiff so as to enable him to take same, constituted actionable negligence imputed to their employer, the defendant herein; as a result of which the District Court properly cast defendant for damages sustained through these negligent acts and omissions." (Emphasis added).
It is clear from the record that there was no lightning damage to the transformer that failed on February 5, 1968. The overload was a reasonable and likely cause of the fuse blowing. Since this is no indication of a dangerous condition, the replacement of the blown fuse with a switch by L.P. & L. without investigation constituted no breach of duty on its part.
OUTAGE AND FIRE OF AUGUST 25, 1968
The cause of this outage and resultant damage is the primary issue. If, as defendant contends, the cause was equipment improperly designed and installed by plaintiffs on Mecom's side of the point of delivery, then it is not liable. On the other hand, if the cause of the outage was transformer failure due to defendant's negligence, then it is liable.
The trial court found as a fact that the most probable cause of the outage and fire was the improper design of the raceway through which the wires entered plaintiffs' plant and for which plaintiff was responsible.
We affirm this factual finding. There was produced, by both parties, much expert testimony bearing on this salient issue. Without reviewing in detail the conclusions of each expert, we will note that they were conflicting and fairly evenly divided. We are most impressed by the testimony of Leroy Naquin, a former employee of Leon Naquin and Son, the electrical contractor that installed the raceway. He testified that he worked on the plate used in the raceway and that it was a steel plate. He further testified that 750 circular mil wires were used in the raceway. According to the standards set forth in the National Electric Code, aluminum, rather than steel, should have been used for the plate; and 500 circular mil, rather than 750, was the proper size. Although Leon Naquin said that he used aluminum and 500 circular mil wire, his invoices therefore were not corroborative. In such a factual determination, the trial court is better able to evaluate live witnesses than we through a cold (and 4,700 page-long) record.
The findings of the trial court are thus entitled to great weight and should not be disturbed where there is, as here, a reasonable basis for its findings, Canter v. Koehring Company, 283 So.2d 716 (La.1973).
Dr. Robert Drake testified that the combination of the 750 circular mil wire and the steel plate used in the raceway resulted in the three phase short circuit, which was external to the transformer and prior to its failure.
Since his opinion was based on facts established in the record, we find no error in the trial court's accepting that conclusion.
DAMAGES
Since L.P. & L. stipulated its liability for the October 2,1968 outage, as well as physical damage to the plant in the amount of $41,350.79, the issues presented are the amount, if any, of loss of production and of extra expense in restoring the plant to operation.
The trial court determined the expense of restoring the plant to normal operation by finding the amount of pay due each employee for extra time worked beyond normal hours (which extra time was attributable to restoration of normal operations), and adding these amounts together. We find no error in this procedure, and affirm the award in the amount of $1,792.59.
The trial court found the value of production lost to be $52,570.00. In arriving at this figure, the Court considered the following:
"Production from October 2 through October 10 was 261 tons. Based on a normal production per day of 195.9 tons this was a loss of 1,502 tons. Average daily production is based on the Area B production *912 from November 1, through November 30, 1968. Except for the outage this production level would have been reached nine days sooner.
The value of the sulfur to the plaintiff ($35.00 per ton) is the difference between the selling price at that time ($43.91 per ton) and the additional cost of production ($8.91 per ton)."
However, based on the trial court's finding that normal production was 195.9 tons per day, this production was not reached until October 31, 1968. Prior to that, the highest per day figure following the outage was 148 tons. Therefore the outage affected production for 29 days, during which time only 2,197 tons were produced, compared with a normal production total for the same period of time of 5,681.1 tons. The difference is the loss of production, 3,484.1 tons. At $35.00 per ton net profit, plaintiffs' loss is $121,943.50.
Defendants contend that plaintiffs suffered no loss of income for the sulfur not mined during the period between the outage and restoration of normal production because the sulfur was not lost but its production merely delayed. A similar contention was rejected in Continental Oil Company v. S.S. Electra, 431 F.2d 391 (5th Cir. 1970). The court therein noted that the plaintiff oil company suffered loss of production equal to net profit for oil the recovery of which was delayed while production equipment was repaired. That reasoning is applicable herein. Stated simply, production for that period of time was forever lost.
ASSESSMENT OF COSTS
LSA-C.C.P. art. 1920 gives the trial court discretion to divide costs as it considers equitable. Also, LSA-C.C.P. art. 192 clearly recognizes the authority of the trial court to appoint its own expert. That article further provides that the reasonable fees and expenses of the expert shall be taxed as costs. Therefore, the trial court was within its discretion in dividing equally the costs, including the fees of its expert, between the plaintiffs and defendant herein.
DECREE
For the reasons assigned, the judgment of the trial court is:
Reversed, as to its finding defendant liable for the February 5, 1968 outage and damages therefor;
Amended, to reflect a loss of production in the amount of $121,943.50 attributable to the October 2, 1968 outage; and
Affirmed in all other respects. All costs are to be paid one-half by the plaintiffs, and one-half by the defendant.
REVERSED IN PART, AMENDED IN PART, AND AS AMENDED, AFFIRMED.